IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| APRIL FONTANA,<br><br>    Plaintiff,<br><br>v.<br><br>THE GUARDIAN LIFE INSURANCE,<br><br>    Defendant._____/ | No. C 08-01231 CRB<br><br>**MEMORANDUM AND ORDER** |

    In this ERISA long-term disability case plaintiff contends that defendant abused its discretion in terminating her long-term disability benefits. Now pending before the Court are the parties' cross motions for judgment on the administrative record. After carefully considering the papers filed by the parties, including the administrative record, the Court GRANTS plaintiff's motion and DENIES defendant's motion.

**BACKGROUND**

    Plaintiff April Fontana worked for Check Point Software Technologies, Inc. as a Software Product Marketing Manager. Her long-term disability benefits plan ("the Plan") was administered and paid under an insurance plan issued by defendant The Guardian Life Insurance Company ("defendant").

    The Plan provides that a beneficiary is entitled to benefits for the first 24 months under a "own occupation" standard: "he or she is completely unable to perform the major duties of his or her regular occupation on a full-time basis." After 24 months the policy

changes to an "any occupation" standard: "the employee is completely unable to perform on a full-time basis the major duties of any occupation or work for which he or she is, or could become, qualified for by training, education or experience."

On January 15, 2004, Dr. Kirsten Young diagnosed plaintiff with probable carpal tunnel syndrome, tenosynovitis, and possible cervical disc protrusion. Dr. Young restricted plaintiff to working no more than four hours per day with no more than 2.5 hours of keyboard use (in intervals of 15 minutes followed by 15 minute breaks). Plaintiff ceased working on February 19, 2004 and applied for short-term disability benefits under the Plan. In June 2004, Dr. Young opined that plaintiff could work eight hours a day with no more than 4-5 hours of keyboarding. In July 2004, plaintiff underwent a Qualified Medical Evaluation by Dr. Peter Wu in connection with her workers compensation claim. Dr. Wu concluded that plaintiff did not have any objective factors of disability; however, he found that plaintiff is precluded from typing no more than five hours in a day, no more than 40 minutes in an hour with 20 minutes on and 20 minutes off.

Defendant paid plaintiff benefits under the "own occupation" standard because defendant's own labor market survey demonstrated that plaintiff's occupation required more than five hours of typing a day. In January 2006 defendant advised plaintiff that after July 9, 2006 she would only be entitled to benefits if she satisfied the "any occupation" definition of disability. In response to a request from defendant, plaintiff submitted further medical records, including a February 2006 report from Dr. Young opining that plaintiff can keyboard up to 4.5 hours a day and that she can work, although not at her usual occupation which requires more than 5 hours of keyboarding a day. In May 2006, defendant again advised plaintiff of the upcoming change to the "any occupation" definition of disability and reported that defendant was in process of evaluating plaintiff's qualification for benefits under that definition.

Defendant subsequently obtained a labor market survey to determine if there were any occupations which plaintiff could perform with her current restrictions, that is, keyboarding no more than five hours in a day, and no more than 40 minutes in an hour, with 20 minutes

on and 20 minutes off. The labor market survey found that plaintiff was employable as a marketing sales manager, business project manager, or sales representative.

Defendant accordingly terminated plaintiff's benefits effective July 9, 2006–the date the "any occupation" standard became applicable. Defendant wrote:

> Utilizing your physical capabilities, as documented in the claim file, together with the information outlining your vocational background, a "Labor Market" survey was performed which revealed that occupations do exist for you [sic] are physically and vocationally prepared to perform.

Plaintiff filed an appeal with defendant in August 2007, after defendant granted plaintiff numerous extensions. The appeal included numerous new medical records, including from records from Dr. Tina Molumphy, who saw plaintiff in October 2006. Dr. Molumphy's report mentions that plaintiff may suffer from possible "thoracic outlet syndrome" or possibly fibromyalgia. Plaintiff had also seen Dr. Tracy A. Newkirk, a neurologist, in December 2006. Dr. Newkirk ordered a MRI/MRA/MRV which was performed in February 2007. On July 6, 2007, Dr. Newkirk issued a report based on his December 2006 exam and the February 2007 MRI/MRA/MRV. Dr. Newkirk found:

> The combination of neck and shoulder pain, tingling and burning paresthesias of the hands and forearms (increased with reaching), upper extremity venous congestion and a very straight spine are sufficient on a clinical basis to make the diagnoses of neurogenic and venous forms of thoracic outlet syndrome.

He also explained that the MRI/MRA/MRV study is the "gold standard" for the diagnosis. Dr. Newkirk concluded that the degree of bilateral thoracic outlet syndrome shown by the study precludes plaintiff from

> any work or even repetitive reaching at or above shoulder level on both sides. She is unable to reach forward even without performing repetitive finger activity with both arms for more than five minutes consecutively rarely during the day. She is unable to perform sustained or repetitive fine hand and finger activity for more than a cumulative total of 20-30 minutes a day, even with an ideal workstation. Any effort that violates these restrictions will increase the neural damage.

Dr. Newkirk also prepared a letter explaining why Dr. Wu's and Dr. Young's diagnoses and disability assessments were wrong.

Defendant chose not to have plaintiff undergo a medical examination and it also chose not to have a physician review her file; instead, her appeal was reviewed by a nurse. By

3

1  letter dated October 31, 2007, defendant denied plaintiff's appeal.  Since the file was not
2  reviewed by a physician and defendant did not have plaintiff submit to an independent
3  medical exam, defendant did not dispute Dr. Newkirk's findings.  Instead, defendant gave
4  two reasons for the denial: (1) since Dr. Newkirk examined plaintiff in December 2006 (and
5  the MRI/MRA/MRV was performed in February 2007) his report is not relevant to whether
6  she was disabled from any occupation as of July 10, 2006-the date the more stringent
7  definition of disability went into effect; and (2) plaintiff's "activities as a graduate student,
8  including the need to continue to write and use a computer, dispute her claim."  This lawsuit
9  followed.

## DISCUSSION

**A.     Standard of Review**

The parties agree that the Plan confers discretion upon defendant to determine eligibility for benefits.  They also agree that defendant has a conflict of interest in the sense that it makes the eligibility decisions *and* funds the plan; thus, any decision to award or not award benefits affects defendant financially.  See Metropolitan Life Ins. Co. v. Glenn, 128 S.Ct. 2343, 2348-50 (2008) (holding that an insurance company that administers a plan and pays benefits has a structural conflict of interest); Burke v. Pitney Bowes Inc. Long-Term Disability Plan, 544 F.3d 1016, 1025 (9th Cir. 2008) (following Glenn's definition of conflict of interest).

The conflict of interest does not alter the standard of review; it remains abuse of discretion.  The district court, however, must:

> take account of the conflict when determining whether the trustee, substantively or procedurally, has abused his discretion. . . . [C]onflicts are but one factor among many that a reviewing judge must take into account. . . . [T]he word 'factor' implies, namely, that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one. . . .  In such instances, any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance.  The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration.  It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps

4

> to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

Burke, 544 F.3d at 1025 (quoting Glenn, 128 S.Ct. at 2350-51 (internal citations omitted)). Thus, this Court must consider defendant's conflict as one factor in determining whether defendant abused its discretion.[1]

**B.  Defendant Abused Its Discretion**

Defendant gave two reasons for upholding the termination of benefits: (1) since Dr. Newkirk examined plaintiff five months after the date on which she must have been disabled from any occupation, his report cannot demonstrate that she was disabled from any occupation as of that date; and (2) plaintiff's "activities as a graduate student, including the need to continue to write and use a computer, dispute her claim." Each of these reasons constitutes an abuse of discretion.

**1.  Dr. Newkirk's Report**

Defendant gave no weight to Dr. Newkirk's report because Dr. Newkirk examined plaintiff in December 2006–five months after the date by which plaintiff had to be disabled from "any occupation" to continue to receive benefits. In other words, defendant asserts that plaintiff's medical condition in December 2006 and February 2007 (the date of the MRI/MRA/MRV) is irrelevant to a determination of her medical condition in July 2006. Defendant's assertion is clearly erroneous and therefore an abuse of discretion.

First, in the social security context, the Ninth Circuit has held that "reports containing observations made after the period for disability are relevant to assess the claimant's disability. It is obvious that medical reports are inevitably rendered retrospectively and should not be disregarded solely on that basis." Smith v. Bowen, 849 F.2d 1222, 1225 (9th Cir. 1988). The same reasoning applies in the ERISA context. Medical reports made after

---

[1] The record is silent as to whether defendant has a history of biased claims administration or whether defendant has taken steps to minimize the impact of its conflict of interest.

5

the period of disability may or may not be relevant to determine if a beneficiary was disabled at an earlier date, but they are not irrelevant solely because of their date.

Second, Dr. Newkirk's evaluation was relevant. He explicitly stated that his diagnosis applied to the time period before July 2006 and that the diagnoses of the other doctors were wrong. He also identified the symptoms and findings reported by Drs. Wu and Young (made during the relevant period) that support his disability determination. Moreover, there is nothing in the administrative record that suggests that what was observed on the February 2007 MRI/MRA/MRV–and which Dr. Newkirk contends constitutes objective evidence of plaintiff's disabling condition–would not have been observed on a MRI/MRA/MRV taken on July 10, 2006.

In <u>Silver v. Executive Car Leasing Long-Term Disability Plan</u>, 466 F.3d 727 (9th Cir. 2006), for example, the district court (and the plan administrator) refused to consider that the plaintiff had required an angioplasty weeks after the disability date. The Ninth Circuit held that this refusal was clear error. <u>Id.</u> at 735.

> While there may have been no acute episode during elimination, the subsequent record clearly demonstrating continuing disability due to precisely the same degenerative cardiac disease makes [the insurer's] position untenable. In light of his rehospitalization in May, we conclude that the only proper interpretation of the evidence is that Silver suffered from an illness that prevented him from working under stressful conditions during the three months after his second angioplasty in December of 2000.

<u>Id.</u> at 736. Similarly here, according to Dr. Newkirk the results of the MRI/MRA/MRV and his December 2006 exam show that plaintiff was disabled in July 2006. Defendant may have a good reason not to accept that opinion, but the medical professional that examined the file did not give any reason; instead, defendant took the legally and factually erroneous position that any reports made after the disability date are irrelevant.

In <u>Allenby v. Westaff, Inc.</u>, 2006 WL 3648655 (N.D. Cal. Dec. 12, 2006), for example, Dr. Newkirk (the same neurologist involved in this case) diagnosed the plaintiff with thoracic outlet syndrome after the relevant disability date. The defendant made the precise argument defendant makes here; namely, that Dr. Newkirk's diagnosis was irrelevant because he did not examine the plaintiff before the disability date. The district court rejected this argument:

6

> Defendants argue that Dr. Newkirk's diagnosis is irrelevant and should be ignored because he did not examine or treat Plaintiff during the "relevant time period." Defendants, however, do not cite any authority for the proposition that courts must ignore a later diagnosis because it was not made contemporaneously with the date of the claimed disability. Indeed, such a rule would penalize anyone who is not properly diagnosed by the initial treating physician(s). Further, it is within a physician's normal exercise of his or her duties to make medical judgments about the onset or cause of a condition, disease, or set of symptoms based on a current examination and review of medical history. The Court also notes that the time gap at issue (between June 2002 and Dr. Newkirk's August 2003 examination of Plaintiff) is not a lengthy one of five or ten years but roughly 14 months.

Id. at *5; see also Crespo v. Unum Life Ins. Co. Of America, 294 F.Supp.2d 980, 986, 994-95 (N.D. Ill. 2003) (holding that insurer abused its discretion by refusing to consider medical reports prepared after disability date; the insurer "made no effort to place these reports in context to determine if they were consistent with earlier diagnoses by other doctors"); Thompson v. Standard Ins. Co., 167 F.Supp.2d 1186, 1194 (D. Or. 2001) (holding that "[t]he fact that a diagnosis is not made contemporaneously within the period that a claimant is insured does not undercut the viability of a later diagnosis based upon medically acceptable techniques. A diagnosis of plaintiff's condition may properly be made several years subsequent to the onset of the disability.") (internal quotation marks and citation omitted).

The case upon which defendant relies, Salomaa v. Honda Long Term Disability Plan, 542 F.Supp.2d 1068 (C.D. Cal. 2008), is easily distinguishable. There the court held that the plan administrator properly discounted a later report that plaintiff suffered from cognitive problems because none of the mental health providers who treated plaintiff during the relevant time period found any cognitive problems; to the contrary, the providers found that plaintiff was mentally alert. Id. at 1081. Here, in contrast, Dr. Newkirk specifically opined that plaintiff's disability existed at the relevant time and he explained why the diagnoses of the other doctors were incorrect.

In sum, defendant does not cite any case that suggests that consistent with its ERISA duties a plan fiduciary may ignore a medical report solely on the basis that it was prepared after the relevant disability date, yet that is precisely what defendant did here. Defendant therefore abused its discretion.

**2.     Plaintiff's Schooling**

7

The second reason defendant gave for affirming the termination of plaintiff's benefits is that her attendance at school to become a speech pathologist is inconsistent with her claim of disability from any full-time occupation. This reason, too, constitutes an abuse of discretion. The record reflects that plaintiff's impairments were impeding her academic responsibilities and that she was receiving accommodations; in fact, she had retained a note taker. Moreover, the nurse that reviewed plaintiff's appeal (the only health professional to do so), recommended that defendant "look into [plaintiff's] school work and how that impacts on her ability to RTW [return to work]." Defendant did not conduct such an investigation; instead, it simply denied the appeal on the basis of her school work even though there is no information in the record that suggests that her school work means she can work full time. This conduct, too, was an abuse of discretion.

**C.   The Remedy**

Having determined that defendant abused its discretion in affirming the termination of plaintiff's benefits, the next question is the proper remedy.

Remand to defendant for reconsideration of plaintiff's appeal is appropriate. See Carter v. Hewlett Packard Co., 2008 WL 5157635 *2 (9th Cir. Dec. 9, 2008) (remanding ERISA case to plan administrator for a new disability determination after it corrects its procedural and substantive errors); Moore v. Bert Bell/Pete Rozelle NFL Player Retirement, 282 Fed. Appx. 599 (9th Cir. June 13, 2008) (remanding ERISA case to the plan administrator for consideration of appropriate vocational evidence). Defendant must consider all of the evidence submitted by plaintiff in support of her appeal, including evidence created after July 10, 2006. In addition, defendant may not rely on plaintiff's schooling, absent some additional evidence which actually suggests that her schooling demonstrates that she can work full time.

Plaintiff contends that under Pannebecker v. Liberty Life Assurance Co., 542 F.3d 1213 (9th Cir. 2008) the Court should remand with instructions to reinstate benefits pending the re-determination of her appeal. In Pannebecker, the plan provided 18 months of benefits under the "own occupation" standard and benefits under the "any occupation" standard after that

8

1 period. The insurer paid benefits under the "own occupation" definition of benefits, but
2 denied continued benefits under the "any occupation" definition after it went into effect. Id.
3 at 1216. The plaintiff sought review of the denial of benefits, and, after obtaining additional
4 evidence, the insurer denied the plaintiff's request for review.

The plaintiff filed suit in district court. The court held that while the evidence was sufficient to show that the plaintiff could perform sedentary work, the record did not identify any specific sedentary jobs that the plaintiff could perform. Accordingly, the district court remanded to the insurer to determine what sedentary positions, if any, the plaintiff could perform.

On remand the insurer obtained a vocational consultant report that identified specific sedentary positions the plaintiff could perform and thus reaffirmed its termination of benefits. 2006 WL 2374845 (D. Ariz. Aug. 16, 2006). The plaintiff administratively appealed the insurer's decision and obtained her own vocational report. The insurer denied the appeal. Id. The district court thereafter upheld the insurer's remand decision. Pannebecker, 542 F.3d at 1217. The court also rejected the plaintiff's claim for retroactive benefits. Id.

The Ninth Circuit affirmed the termination of the plaintiff's benefits. Id. at 1221. The court also held, however, that the district court *abused its discretion* by denying the reinstatement of benefits from the time of the original termination of benefits through the date of the insurer's decision that was ultimately affirmed. The court held that "the ERISA claimant whose initial application for benefits has been wrongly denied is entitled to a different remedy than the claimant whose benefits have been terminated." Id. at 1221.

> Where an administrator's initial denial of benefits is premised on a failure to apply plan provisions properly, we remand to the administrator to apply the terms correctly in the first instance. But if an administrator terminates continuing benefits as a result of arbitrary and capricious conduct, the claimant should continue receiving benefits until the administrator properly applies the plan's provisions.

Id.

Pannebecker governs this case. There, as here, the plaintiff received benefits under the "own occupation" definition of benefits. There, as here, after the definition changed to "any occupation," the insurer terminated benefits on the ground that the evidence did not support

9

this higher standard. There, as here, the insurer erred in making its "not disabled" determination and thus the case was remanded for a new disability determination. Accordingly, here, as in Pannebecker, benefits should be reinstated and paid retroactively.

## CONCLUSION

Defendant abused its discretion by refusing to consider Dr. Newkirk's report and the other post-July 10, 2006 evidence solely on the ground that the evidence was developed after the date of the change in the definition of disability. Defendant also abused its discretion by affirming the termination of benefits on the ground that plaintiff attends school to become a speech therapist. Defendant ignored the evidence as to plaintiff's accommodations, including the hiring of a note taker, and ignored the recommendation of its medical reviewer that further investigation be conducted to determine *if* plaintiff's schooling is consistent with her disability claim. The Court concludes that defendant abused its discretion without consideration of the conflict of interest; when the Court takes defendant's conflict of interest into account, defendant's abuse of discretion is even more apparent.

Accordingly, plaintiff's disability claim shall be remanded to defendant for a new determination of plaintiff's administrative appeal of the termination of benefits. In the meantime, plaintiff's benefits must be reinstated and paid retroactively.

**IT IS SO ORDERED.**

Dated: Jan. 9, 2009

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE